**Warneda ANDERSON,**

v.

**Larry G. MASSANARI, Acting Commissioner of Social Security.**

**No. CIV. 3:01CV0733(HBF).**

United States District Court, D. Connecticut.

June 4, 2002.

Richard W. Gifford, Wethersfield, CT, for Plaintiff.

Ann M. Nevins, Bridgeport, CT, for Defendant.

*RULING ON PENDING MOTIONS*

FITZSIMMONS, United States Magistrate Judge.

Plaintiff brought this action under §§ 205(g) and 1631(a)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), for review of the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") for the period beginning December 31, 1994, and ending January 4, 1998. Pending are plaintiff's motion for judgment on the pleadings [doc. # 5] and defendant's motion for order affirming the decision of the commissioner [doc. # 8].

I. *PROCEDURAL HISTORY*

Plaintiff applied for DIB and SSI on October 8, 1996. (*See* Certified Transcript of Administrative Proceedings, filed July 23, 2001 ["Tr."] 108–10, 265–68.) The Commissioner denied the claims initially (*see* Tr. 84–88) and upon reconsideration (*see* Tr. 277–280), on November 21, 1996, and April 24, 1997, respectively.

On May 19, 1997, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"]. (*See* Tr. 100–02.) A hearing was held before ALJ Halstead H. Clark ("ALJ" or "ALJ Clark") on February 12, 1998. (*See* Tr. 106, 62–81.) Plaintiff was represented by counsel. (*See* Tr. 98–99.) On March 23, 1998, ALJ Clark issued a "partially favorable" decision, denying plaintiff's claim of disability up until the date of January 5, 1998, but finding plaintiff disabled as of January 5, 1998. The ALJ asserted that, before January 5, 1998, "[t]he medical evidence does not support the finding of a disability." (Tr. 287.)

Plaintiff appealed the ALJ's decision on May 27, 1998. (*See* Tr. 292–96.) On October 9, 1998, the Appeals Council affirmed the ALJ's finding that plaintiff was disabled beginning January 5, 1998, but noted that there were inconsistent findings concerning plaintiff's residual lifting capacity. (*See* Tr. 297–99.) Thus, the Appeals Council remanded the case to the ALJ for the express purpose of reviewing the time period before January 5, 1998. (*See* Tr. 297–99.)

The hearing required by the Appeals Council was held on November 25, 1998, before ALJ Clark. (*See* Tr. 28, 32.) The ALJ's decision on May 24, 1999, found the claimant to be "not disabled" before January 5, 1998. (Tr. 25.) The ALJ relied on Sections 404.1569 and 416.969 as well as the framework of Rule 202.10, Table 2, Appendix 2, Subpart P, Regulations No. 4. (*See* Tr. 26.)

Plaintiff requested review by the Appeals Council on June 8, 1999. (*See* Tr. 10.) The Appeals Council denied plaintiff's request for review on March 23, 2001. (*See* Tr. 8–9.) Plaintiff then appealed to this court, as provided for in sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)).

## II. *Factual Background*

Plaintiff was born on January 5, 1943. (*See* Tr. 108.) Plaintiff attended school through the eighth grade, which she completed in 1956. (*See* Tr. 127.) She attended a self-described "General School" for improved reading and writing skills in the 1990's. (*See* Tr. 127.) Plaintiff has not engaged in any substantial gainful activity since December 31, 1994, when she left her metal parts assembly job at Pratt and Whitney. (*See* Tr. 22.) Plaintiff alleges that a combination of Carpal Tunnel Syndrome, back problems, syrinx [1] headaches, elbow problems, and high blood pressure have hindered her ability to work. (*See* Tr. 123.) Plaintiff had bi-lateral Carpel Tunnel surgery in 1989 to alleviate discomfort and loss of dexterity in her hands and wrists. (*See* Tr. 240.) In 1990 and 1991, plaintiff had bilateral ulnar nerve release surgery to remedy her elbow pain and a loss of dexterity. (*See* Tr. 240.) On March 5, 1996, plaintiff had major surgery to decompress a Chiari I malformation.[2] (*See* Tr. 217.)

---

1. The syrinx is "[a] pathologic tube-shaped cavity in the brain or spinal cord." Stedman's Medical Dictionary 1545 (25th Ed.1990).

2. A Chiari I malformation is one of two types of Arnold Chiari Syndrome. "Arnold Chiari Syndrome is a rare malformation of the brain that is present at birth. Abnormalities at the base of the brain may include the displacement of the lower portion of the brain (cerebellum) and/or brain stem through the opening in the back of the skull (foramen magnum). Portions of the brain typically reach the spinal canal (upper cervical area) ... Chiari Type I is used to describe individuals who have an extension of the brain into the spinal canal without a myelomeningocele." WebMD, *http://my.webmd.com/encyclopedia/article/1826.50763* (last updated Feb. 4, 1998; last visited May 15, 2002).

1. *Plaintiff's injuries to her wrists, elbows, and right thumb*

Plaintiff claims that injuries to her wrists, elbows, and right thumb have limited her ability to work.

Dr. Derrick Woodbury examined plaintiff on many occasions during the period of September 1991 to February 1996. These visits were primarily to assess and assist plaintiff's recovery from bilateral Carpal Tunnel syndrome surgery and bilateral elbow nerve decompression surgery.

After one such visit on June 28, 1993, Dr. Woodbury noted that plaintiff had "maximum medical improvement"[3] in her right hand and elbow. He noted that plaintiff had a 3% permanent partial impairment in her right hand, and 5% permanent partial impairment in her right elbow. (*See* Tr. 167.) On August 30, 1993, Dr. Woodbury noted that plaintiff's left elbow had reached maximum medical improvement, adding that it had a 5% permanent partial impairment. (*See* Tr. 168.)

Dr. Woodbury noted inconsistent but frequent flare-ups of severe wrist and ulnar pain in plaintiff's arm over the course of 1994 prior to her departure from her job at Pratt and Whitney. (*See* Tr. 169–175.) Plaintiff elected to have surgery to alleviate this pain in October 1994. (*See* Tr. 175.)

On January 12, 1995, after a visit from plaintiff, Dr. Woodbury stated in his written report that, "if work was available for her," plaintiff could return to work "with restrictions."[4] (Tr. 178.) Dr. Woodbury recommended at that time that plaintiff not do any heavy lifting with her right hand, nor any torque activities with her right thumb. (*See* Tr. 178.) Furthermore, Dr. Woodbury felt that plaintiff should be restricted from repetitive motions with her arms and hands. (*See* Tr. 178.)

On March 23, 1995, plaintiff again complained to Dr. Woodbury of wrist and thumb pain. (*See* Tr. 179.)

On May 11, 1995, Dr. Woodbury reported that plaintiff felt little to no pain in her wrists. (*See* Tr. 181.) He noted some permanent ulnar neuropathy that would likely not ever fully be recovered, and restricted plaintiff from "burring" or using "vibratory tools". (*See* Tr. 181.)

On July 10, 1995, Dr. Woodbury stated that plaintiff's right wrist, thumb, and hand had reached maximum medical improvement. (*See* Tr. 182.) Plaintiff had an 8% permanent partial impairment in her right hand and wrist when her previous carpal tunnel syndrome rating was included. (*See* Tr. 182.)

On October 12, 1995, plaintiff returned to Dr. Woodbury "very uncomfortable with pain" in her right and left hands and wrists. (*See* Tr. 183.)

A visit to Dr. Woodbury on December 4, 1995, revealed that plaintiff was still experiencing discomfort and inflammation in both her right and left hands and wrists. (*See* Tr. 185.)

On December 19, 1996, plaintiff returned to Dr. Woodbury's office. (*See* Tr. 187.) Dr. Woodbury found erosion in the basilar

---

**3.** The term "maximum medical improvement" refers to the point during a patient's recovery from injury or other impairment when the technology or methods of modern medicine can no longer have any beneficial effects on that injury or impairment. *See, e.g., Palombo v. Director, OWCP*, 937 F.2d 70, 76 (2d Cir.1991) (defining "maximum medical improvement" as "the point when the injury has healed to the full extent possible," which "marks the end of the temporary period of disability; thereafter any remaining injury is considered permanent").

**4.** Dr. Woodbury did not specify in that report the type of restrictions to which he referred.

joint of the left thumb and wear and tear. (*See* Tr. 187.)

On April 3, 1997, plaintiff returned with "acute exacerbation of both her right and left wrists." (Tr. 253.) Doctor Woodbury found her to be in "quite a fair amount of discomfort." (Tr. 253.)

At a visit on June 5, 1997, plaintiff had improved.[5] (*See* Tr. 250.) The doctor again noted residual symptoms in both hands, but "attempt[ed] to treat these conservatively and allow her to continue to work." (Tr. 250.)

On July 10, 1997, plaintiff complained of continuing pain, weakness, and swelling. (*See* Tr. 249.)

On September 8, 1997, Dr. Woodbury noted that plaintiff failed a physical administered by a Pratt and Whitney doctor, who felt she could not perform her old job due to the condition of her hands, wrists, and elbows. (*See* Tr. 248.) Plaintiff complained of pain in her right wrist and thumb. (*See* Tr. 248.)

In his final report on February 9, 1998, Dr. Woodbury noted the following about plaintiff's condition:

I believe [plaintiff] has reached maximum medical improvement regarding her work related injuries. The patient has decreased nerve function in both her ulnar nerve in her right elbow and her median nerve in her right hand. She has significant arthritis at the metacarpal trapezial joint of her right thumb.... The patient still has decreased stamina and decreased sensation, decreased strength and decreased endurance in her right upper extremity due to these work related problems.... [T]he patient has a 7% permanent partial impairment of her right elbow. [S]he has a 3% permanent partial impairment of her right hand secondary to her carpal tunnel and a 12% permanent partial impairment of her right thumb due to her degenerative arthritis at the metacarpal trapezial joint.

(Tr. 264.)

### 2. *Plaintiff's Neck and Back Pain, and Headaches*

Plaintiff claims neck/upper-back pain and headaches have also limited her ability to work.

Plaintiff complained of neck pain and headaches in February, 1996, when she visited Dr. David Kruger on referral from Dr. Woodbury. (*See* Tr. 223.) Dr. Kruger felt further diagnostic tests were necessary to determine the causes of plaintiff's headaches and upper-extremity weaknesses. (*See* T. 224.)

The tests were conducted on the February 10, 1996. (*See* Tr. 210–11.) The Verified Results Report from St. Francis Hospital and Medical Center indicates the results of a Magnetic Resonance Imaging ("MRI") examination on plaintiff, that "[t]here is a large cervical syrinx," and "a Chiari I Malformation." (Tr. 210.)[6]

On March 5, 1996, plaintiff underwent major surgery at Saint Francis Hospital to correct and decompress the Chiari I malformation that existed in her cervical spinal cord between C3 and C6. (*See* Tr. 217.)

On March 18, 1996, plaintiff visited Dr. Stephen Calderon for a post-operative as-

---

**5.** It is important to note that Dr. Woodbury occasionally treated plaintiff's discomfort and swelling with cortisone shots to the affected area (*see* Tr. 170), and, more frequently, recommended conservative methods such as heat, massage, rest, and over-the-counter anti-inflammatory medicines (*see* Tr. 169). All treatments and visits are not necessarily noted herein.

**6.** For a description of these terms, see notes 1 & 2, *supra*.

sessment. (*See* Tr. 225.) Doctor Calderon found improvement in the numbness and pain in her hands, with some residual numbness in her fingertips. (*See* Tr. 225.)

On July 15, 1996, Dr. Calderon reported that plaintiff had sensory loss in her left hand, and retained numbness in her right hand, although it was not as severe as that numbness had been in the past, and was "only intermittent in nature." (*See* Tr. 228.)

On January 2, 1997, when plaintiff returned to see Dr. Calderon, she complained of pain in her right shoulder muscle and neck after attempting to return to work. She described her employment as "on and off." Dr. Calderon prescribed a regimen of physical therapy, which he thought might help relieve some of plaintiff's pain symptoms. (*See* Tr. 229.)

### 3. *Plaintiff's Cardiovascular condition*

Plaintiff also claims to suffer from cardiovascular difficulties.

Plaintiff had a heart murmur discovered in a pre-operative physical for her carpal tunnel surgery in 1989. (*See* Tr. 188.) In a visit on May 8, 1992, with Dr. Donald Ruffett, plaintiff complained of "some shortness of breath and a tightness in the center of her chest, lasting a few seconds at a time, usually with activity, but also sometimes at rest." (Tr. 188.) Dr. Ruffet,

a cardiologist, found "mild aortic stenosis and insufficiency." Dr. Ruffett further found that plaintiff had systolic hypertension. (*See* Tr. 189.) He also listed obesity and plaintiff's half-pack to one-pack-a-day smoking habit as negative heart health characteristics. (*See* Tr. 188–89.) He recommended monitoring plaintiff's blood pressure with possible future treatment and recommended that plaintiff stop smoking and lose weight. (*See* Tr. 188, 189.)

After plaintiff visited Dr. Ruffet's office again on April 6, 1993, Dr. Ruffett found no change in plaintiff's heart condition. (*See* Tr. 193.)

### 4. *Plaintiff's ability to work*

Plaintiff's ability to perform the functions of work related activities was assessed by several different doctors.

On February 9, 1998, *after* the ALJ's date of disability, Dr. Woodbury[7] reported that plaintiff could lift up to 20 pounds, but could only lift 10 pounds occasionally. (*See* Tr. 255.) "Occasionally" is defined as, "from very little to up to 1/3 of an 8 hour day." (Tr. 255.) Dr. Woodbury also reported that plaintiff's ability to feel and the ability to push/pull were diminished. (*See* Tr. 256.)

In a March 18, 1997 evaluation, a Dr. Bailey reported that plaintiff could lift up

---

**7.** In his first decision, the ALJ mistakenly attributed this report to a "Dr. Buffet." (Tr. 288.) Plaintiff's attorney made a similar mistake in his May 22, 1998 letter to the Appeals Council, when he argued that "the ALJ states that Dr. Buffet, who is a cardiologist, states that the weight limit is upon considering her 'combined impairments,' but in fact this assessment is based on her cardiac conditions alone." (Tr. 294.) Apparently, both the ALJ and plaintiff's counsel intend to refer to Dr. *Ruffet,* a cardiologist that plaintiff visited. (*See, e.g.,* Tr. 263.) However, under the court's reading of the record, it was Dr. Woodbury who saw plaintiff on February 9,

1998. (*See* Tr. 264; *compare also* Tr. 256 (signature on February 9, 1998 report) *with* Tr. 207 (signature of Dr. Woodbury).) In any event, the diagnosis of plaintiff's impairment as of February 9, 1998, is not dispositive. First, the ALJ makes findings based on the record as whole, not based on any specific piece of evidence. Second, plaintiff's condition may have improved after the December 31, 1994, to January 4, 1998, time period-the time period that is relevant to this decision. Thus, the court looks ultimately to the findings in the ALJ's second decision, which specifically dealt with the relevant time period.

to twenty (20) pounds occasionally and lift up to ten (10) pounds frequently, and further indicated that plaintiff could walk or stand for six hours out of an eight-hour workday. (*See* Tr. 233.) The report also indicated no limitations on plaintiff's ability to push and/or pull. (*See* Tr. 232–39.)

On November 12, 1996, Dr. David Bomar, of the Connecticut Bureau of Disability Determination, performed a disability determination of plaintiff. (*See* Tr. 230–31.) The doctor was aware of only certain portions of plaintiff's medical history. For example, Dr. Bomar noticed the scar on plaintiff's neck, but did not know all of the procedures plaintiff had undergone or their purposes. (*See* Tr. 230.) The doctor tested plaintiff's range of motion in her cervical spine and her lumbar spine, and found them normal. (*See* Tr. 230–31.) He detected reduced sensation in plaintiff's fingers with a pinprick test. (*See* Tr. 230.) He also reported "a full range of motion in the shoulders, elbows, and wrists in the upper extremities." (Tr. 231.) Dr. Bomar believed "there were no significant findings of any impairment" in plaintiff. (Tr. 231.)

### 5. *The ALJ's Rulings*

The ALJ issued his first ruling on March 23, 1998. (*See* Tr. 286.) In that ruling, the ALJ found plaintiff disabled as of January 5, 1998 (the date she turned fifty-five years old) but not disabled for the period from December 31, 1994 (the alleged onset date) until January 5, 1998. (*See* Tr. 287.) The ALJ based its decision, in part, on a February 9, 1998 report erroneously attributed to a Dr. Buffet (*see, supra,* note 7), which purportedly supported the ALJ's finding that plaintiff was able to lift up to, but no more than, twenty pounds, and thus was limited to performing certain "light work." (*See* Tr. 288, 290.) The ALJ acknowledged that, be-cause plaintiff could not return to any past relevant work, the burden shifted to the Social Security Administration to establish that the claimant could perform any other work which existed in significant numbers in the national economy. (*See* Tr. 289.) Without much analysis, the ALJ concluded that plaintiff was disabled as of January 5, 1998, but not before then. (*See* Tr. 291.)

On October 9, 1998, the Appeals Council remanded the portion of the ALJ's decision that found plaintiff not disabled prior to January 5, 1998. The basis for the remand (*see* Tr. 298) was the Appeals Council's determination that the following two findings of the ALJ were "inconsistent":

5. The claimant has the residual functional capacity to perform the physical exertion requirements of work except for walking or standing for prolonged periods of time. The claimant is restricted to lifting or carrying 20 pounds or less, repeatedly, during the workday. The claimant is further restricted in the use of her right upper extremity. . . .

7. The claimant has the residual functional capacity to perform an essentially full range of light work, with restrictions in the use of her right upper extremity. (Tr. 290.)

The Appeals Council noted that, contrary to the conclusion reached in finding no. 7, "finding no. 5 indicate[d] significant exertional limitations which could further restrict the claimant's ability to perform an essentially full range of light work ..." (Tr. 298.) The Appeals Council also issued several important mandates, which required that the ALJ, with respect to "the pertinent period": (1) give further consideration to the treating and examining source opinions; (2) give further consideration to the claimant's maximum residual

functional capacity and provide appropriate rationale with specific references to evidence of record; and (3) obtain evidence from a vocational expert to clarify the effect of the assessed limitations, with hypothetical questions which "should reflect the specific capacity/limitations established by the record as a whole." (Tr. 299.)

On remand, the ALJ held a second hearing on November 25, 1998. (*See* Tr. 32–61.) As required by the Appeals Council, the ALJ, *inter alia*, heard testimony from a vocational expert. (*See* Tr. 51–61.) Also as directed, the ALJ asked hypothetical questions to the vocational expert, including one which asked the expert to assume the existence of an individual who had "no restriction ... in sitting, standing, or walking," but who had "a lifting restriction of ten pounds." (Tr. 52; *see also* Tr. 53.) [8] Therefore, given the Appeals Council's requirement that any hypothetical questions "reflect the specific capacity/limitations established by the record as a whole" (Tr. 299), the court assumes that the ALJ found that a ten-pound restriction was established by the record as a whole. Indeed, the ALJ's second ruling confirms this assumption.

The ALJ issued his second ruling on March 24, 1999. (*See* Tr. 21–26.) With respect to plaintiff's wrist, elbow, and thumb injuries, the only report from a treating physician that the ALJ cited was a 1995 report from Dr. Woodbury.[9] (*See* Tr. 23 (citing the report located at Tr. 178).) The ALJ characterized this report as indicating "that the claimant had made gains in physical therapy and could work with restrictions in lifting and repetitive motion." (Tr. 23.) However, although Dr. Woodbury did state that he believed that, "if work was available for her she could work with restrictions," he did not suggest what type of work might be "available" (i.e., light work, sedentary work, etc.). Nor did he list any specific restrictions other than that "she would be limited in heavy lifting with her right hand[,] would be limited in doing no torque activities with her right thumb," and "[r]epetitive motion activities would need to be restricted as well." (Tr. 178.) [10]

Based on this and other evidence, the ALJ found that, "during the period at issue, the claimant retained the residual functional capacity to perform the exertional demands of a reduced range of light

---

**8.** The vocational expert testified that plaintiff had the ability to make a vocational adjustment with her condition and be employed in some light weight jobs such as an order caller, a school crossing guard, and a security guard monitor watcher. The vocational expert testified that 5,500, 1,050, and 12,670, of these jobs respectively were available in the local economy. (*See* Tr. 24.)

**9.** The ALJ also cited comments by Dr. Calderon that plaintiff had experienced improvement and could start looking for work. Dr. Calderon treated plaintiff for her cervical syrinx. Also, although Dr. Calderson noted, on March 18, 1996, that he "told [plaintiff] that she can start looking for another job," Dr. Calderon does not indicate that she was able to obtain "another job" between December 31, 1994, and the date of the visit. Moreover,

there are several reports of pain and problems from future visits. (*See e.g.,* Tr. 226, 227, 228, 229.)

**10.** In his previous report, on December 1, 1994, Dr. Woodbury suggested that the only acceptable restrictions would be "only us[ing] her left hand" because her right hand needed strengthening and a range of motion program. (Tr. 177.) On January 12, 1995, Dr. Woodbury noted that plaintiff had gained range of motion and strength, but also maintained that certain "restrictions" were still necessary. (Tr. 178.) Thus, it is difficult to determine what plaintiff's capabilities were as of January 12, 1995. Furthermore, Dr. Woodbury notes many other problems with plaintiff subsequent to the January 12, 1995 visit. (*See generally* Tr. 179–87.)

work." (Tr. 24.) However, he also found that, although plaintiff had unlimited ability to stand, she "could only lift 10 pounds and had to limit repetitive motions of her upper extremities." (Tr. 24.) More specifically, the ALJ found that plaintiff "lacked the residual functional capacity to lift and carry more than 10 pounds or perform repetitive hand movements during the period before January 5, 1998." (Tr. 25 ¶ 5.) Despite these findings, the ALJ concluded that, because plaintiff was capable of performing some light work, a finding of "not disabled" is required by application of the framework of Medical–Vocational Rule 202.10. (*See* Tr. 24, 26 ¶ 10.)

### III. ANALYSIS

Plaintiff alleges that the ALJ committed reversible error in the following ways: (1) applying the "light" grid table when he should have applied the "sedentary" grid table; (2) improperly discrediting plaintiff's complaints of pain and her allegations of impairment; (3) failing to determine the extent of erosion of plaintiff's occupational base before applying the medical-vocational guidelines; (4) failing to analyze the impact on plaintiff's occupational base of loss of bimanual dexterity and inability to walk or stand for prolonged periods; (5) not considering plaintiff's favorable work history; and (6) relying upon vocational expert testimony that conflicted with the dictionary of occupational titles. The court agrees with plaintiff's first reason and therefore reverses the decision of defendant, and remands for a calculation of benefits under 42 U.S.C. § 405(g).[11]

The regulations regarding DIB and SSI provide that "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools ..." 20 C.F.R. § 404.1567(a); 20 C.F.R. § 416.967(a). On the other hand, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds ..." 20 C.F.R. § 404.1567(b); 20 C.F.R. § 416.967(b). To apply a particular grid, an individual must be capable of performing a "full range" (all or substantially all) of work at that exertional level. *See* SSR 83–10, 1983 WL 31251, *3, *6 (S.S.A. 1983); SSR 83–11, 1983 WL 31252, *2 (S.S.A.1983). *See also Bapp v. Bowen*, 802 F.2d 601, 606 n. 1 (2d Cir.1986) (while an individual "need not be able to perform each and every job in a given range of work ... 'unless the individual possesses physical capacities equal to the strength requirements for most of the jobs in that range, he or she cannot be classified as able to do the pertinent range of work' ") (quoting 43 Fed.Reg. 55,349, 55,361 (1978)). Consequently, an individual with a weight restriction of ten pounds cannot perform a full range of light work, but can perform a full range of sedentary work. *Cf.* SSR 96–9P, 1996 WL 374185, *1 *2 (S.S.A. July 2, 1996) (residual functional capacity "is the individual's maximum remaining ability to perform sustained work ... [i]t is not the least an individual can do, but the most ...").

The ALJ found that plaintiff was restricted to lifting a maximum of ten pounds during the applicable time period. This finding appears at least twice in the ALJ's second ruling, and is implicit in the ALJ's hypothetical to the vocational expert at the second hearing. Because this finding is supported by substantial evidence in the record, the court affirms and relies on it.[12]

---

**11.** Because the court finds reversible error on the first ground, it does not address, and expresses no opinion with respect to, the other grounds listed by plaintiff.

**12.** In the ALJ's first decision, he seemed to

Under the regulations, therefore, plaintiff was able to perform only a full range of "sedentary" work, and the ALJ erred by applying the "light" grid table to plaintiff. Had the ALJ applied the correct grid, the ALJ would have reached the conclusion that plaintiff was disabled. The ALJ found that plaintiff: (1) was "closely approaching advanced age," (2) had "a limited education," and (3) had "unskilled work experience." (Tr. 25–26, ¶¶ 7, 8, and 9, respectively.) Consequently, applying the sedentary grid-as the ALJ should have done given his finding that plaintiff "lacked the residual functional capacity to lift and carry more than 10 pounds" (Tr. 25 ¶ 7)—plaintiff was "disabled" for the relevant time period. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.09.

Given the incorrect application of the grids, and the contrary result reached through a proper application, the decision to deny plaintiff's claim is reversed. *Cf. Bapp,* 802 F.2d at 605 ("If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate"). Moreover, because the court relies, *in toto,* on the ALJ's explicit findings, the matter need not be remanded for further findings.[13] Instead, in an effort to carry out "Congress' mandate to foreshorten the often painfully slow process by which disability determinations are made," *Carroll v. Secretary of Health And Human Services,* 705 F.2d 638, 644 (2d Cir.1983), *quoted in, Balsamo v. Chater,* 142 F.3d 75, 82 (2d Cir.1998), the matter is remanded only for a calculation of benefits under 42 U.S.C. § 405(g).

suggest that plaintiff could lift up to twenty pounds. In light of the unspecific and varying medical records, and given the standard of review, the court might also have found that decision to be supported by substantial evidence.

### IV. *CONCLUSION*

For the reasons stated, plaintiff's motion for judgment on the pleadings [**doc. # 5**] is **GRANTED,** and defendant's motion for order affirming the commissioner's decision [**doc. # 8**] is **DENIED.** The case is remanded for a calculation of benefits under 42 U.S.C. § 405(g).

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [doc. # 13] on October 18, 2001, with appeal to the Court of Appeals.

**13.** In other words, the court finds the factual findings regarding plaintiff's age, education, skill, and exertional capabilities to be supported by substantial evidence, but holds that the ALJ improperly applied the regulations (specifically, the grids) to the facts.